IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM A., individually and on behalf of A.A., a minor, | ) | |
| Plaintiff, | ) | No. 24 C 4174 |
| v. | ) | Judge Robert W. Gettleman |
| HEALTH CARE SERVICE CORPORATION d/b/a BLUE CROSS BLUE, SHIELD of TEXAS | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William A., individually and on behalf of A.A., his minor child, brought a two-count complaint against defendant Health Care Service Corporation, doing business as Blue Cross Blue Shield of Texas. Count I is claim for recovery of benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et. seq. ("ERISA").[1] Plaintiff alleges that defendant failed to provide benefits due to him under the terms of his plan in violation of 29 U.S.C. §1132(a)(1)(B) when defendant denied coverage for A.A.'s treatment. Count II is a claim for violation of the Mental Health Parity and Addiction Equity Act of 2008, 29 U.S.C.§1185a (the "Parity Act"). Plaintiff alleges that defendant disparately applied medical necessity criteria between medical/surgical and mental health treatment in violation of the Parity Act. Plaintiff and defendant both move for a trial on the papers under Rule 52. For the reasons explained

[1] The complaint is styled as "causes of action" rather than "counts." For convenience, the court refers to these causes of action as counts.

below, the court finds for plaintiff on Count I and for defendant on Count II.

## BACKGROUND

This case is about the denial of health insurance benefits. Plaintiff and his minor child, A.A. were covered by plaintiff's health plan (the "plan") at all relevant times.[2] A.A. has long suffered from serious mental health issues, as will be discussed in more detail below. In 2021, A.A.'s mental health deteriorated to the point where his health providers decided that he required treatment in a residential treatment center ("RTC"). A.A. received care at an RTC called the Menninger Clinic from August 12 through October 20, 2021. The Menninger Clinic strongly recommended that A.A. be treated at a different RTC called "Elevations." A.A. was admitted to Elevations on October 21, 2021. After 26 days of treatment, defendant denied coverage for continued treatment at Elevations after November 17, 2021. A.A. remained at Elevations until he was discharged on May 16, 2023. The issue at the center of this case is whether A.A.'s treatment from November 18, 2021, through May 16, 2023, was covered by plaintiff's health plan.

Before reaching the core question, the court must address the standard of review it will apply. Both parties here have moved for judgment on the administrative record under Rule 52(a). That rule governs "an action tried on the facts without a jury." Fed. R. Civ. P. 52(a). When the parties agree to proceed under Rule 52 without a trial, "[i]n effect the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery." Cook Inc. v. Bos. Sci. Corp., 333 F.3d 737, 741 (7th Cir. 2003). As courts in this circuit have noted, the procedure "is well-suited to ERISA

[2] The court refers to A.A. by male pronouns because A.A. currently uses male pronouns.

cases in which the court reviews a closed record," such as this one. Fontaine v. Metro. Life Ins. Co., 800 F.3d 883, 885 (7th Cir. 2015); see also Druhot v. Reliance Standard Life Ins. Co., No. 16-CV-2053, 2017 WL 4310653, at *1 (N.D. Ill. Sept. 28, 2017) (collecting cases).

Because plaintiff seeks to enforce benefits under his policy, he bears the burden of proving his entitlement to the benefits by a preponderance of the evidence. Ruttenberg v. U.S. Life Ins. Co. in City of New York, 413 F.3d 652, 663 (7th Cir. 2005); see also Curtis v. Hartford Life & Accident Ins. Co., 64 F. Supp. 3d 1198, 1212 (N.D. Ill. 2014). The Seventh Circuit has stated that "[t]he preponderance standard is a more-likely-than-not rule, under which the trier of fact rules for the plaintiff if it thinks the chance greater than 0.5 that the plaintiff is in the right." Binion on Behalf of Binion v. Chater, 108 F.3d 780, 783 (7th Cir. 1997).

In an ERISA case, "[a] district court reviews de novo a denial of benefits unless the plan grants to the plan administrator the discretionary authority to construe policy terms." Ruttenberg, 413 F.3d at 659. Here, the parties agree that the plan does not grant the plan administrator such discretionary authority. Thus, the court must review de novo whether plaintiff is entitled to the benefits at issue under the plan. As other courts have explained, the term "review" is misleading in this context; the court's task here is to independently decide whether the plaintiff has met his burden of proving that he is entitled to have defendant cover the cost of A.A.'s treatment at Elevations from November 18, 2021, through May 16, 2023. See Dorris v. Unum Life Ins. Co. of Am., 949 F.3d 297, 303–04 (7th Cir. 2020); C. T. v. BlueCross BlueShield of Illinois, No. 23 CV 6112, 2025 WL 4092204, at *3 (N.D. Ill. Apr. 17, 2025).

In reaching a decision, the court has "no legal obligation to discuss each piece of evidence in the record," to "make findings on all facts presented," "to conform [its] opinion[ ] to

any particular template or to produce decisions of any particular length." Oye v. Hartford Life & Accident Ins. Co., 140 F.4th 833, 838 (7th Cir. 2025) (citations omitted). Indeed, "Rule 52(a) requires only that the district court 'find the facts specially and state its conclusions of law separately.'" Id. (quoting Fed. R. Civ. P. 52(a)). In the end, what matters is that the court include "sufficient subsidiary facts so that [an appellate court] can clearly understand the steps by which [the court] reached its ultimate conclusion," and that the court's "ultimate decision is plausible in light of the record viewed in its entirety." Id. (cleaned up).

## FINDINGS OF FACT[3]

Plaintiff and A.A. are members of a fully insured employee welfare benefit plan under ERISA, issued by defendant. The plan provides coverage for mental health services. These mental health services fall on a continuum from the least restrictive and intense services to the most restrictive and intense services. The highest, or most restrictive and intense, level of service is 24-hour care in a hospital. One level below that is treatment at an RTC. Patients treated at an RTC live onsite at a facility with 24-hour medical availability and onsite nursing. Below the level of an RTC, treatment options covered by the plan include care at psychiatric day treatment facility ("PDTF"), in which the patient receives treatment for up to eight hours in any 24-hour period, and intensive outpatient programs ("IOP"), which provide services for at least three hours per day, two or more days per week. For each of these levels of care, the plan requires the treatment to be "medically necessary."

This case is centered on whether A.A.'s continued treatment at Elevations beyond

[3] In accordance with the requirements of Fed. R. Civ. P. 52(a)(1), the court will "find the facts specially and state its conclusions of law separately." The facts here come from the court's review of both parties' proposed findings of fact and the administrative record.

November 17, 2021, was "medically necessary." The plan defines "medically necessary." Acting as the finder of fact, the court determines whether A.A.'s continued treatment at Elevations beyond November 17, 2021, meets this definition. To make that factual determination, the court reviews A.A.'s medical history before Elevations, A.A.'s treatment at Elevations, and the relationship between the care guidelines used to evaluate the necessity of A.A.'s continued treatment at Elevations and the plan's definition of medical necessity.

**A.A.'s medical history before Elevations**

From a young age, A.A. struggled with making and keeping friends. A.A. would frequently isolate himself in his room during childhood. In second grade, A.A. was diagnosed with attention deficit hyperactivity disorder ("ADHD").

A.A. received treatment from Dr. Joshua Cabrera with Texas A&M Behavioral Health from October 19, 2018, to September 16, 2019. In that time, A.A. was diagnosed with cyclothymia, a condition akin to bipolar disorder that causes severe mood swings. A.A. disclosed disturbing information to Dr. Cabrera that was unknown to his parents. A.A. stated that he harbored suicidal thoughts since the time that he was in second grade. A.A. admitted that he attempted suicide at least once by jumping into traffic. This attempt failed as the car was able to swerve away. A.A. also told Dr. Cabrera that he entertained thoughts of killing someone else and was fascinated with serial killers.

On September 2, 2019, plaintiff received a call from a pastor at their church. The pastor informed plaintiff that the church had received a note on a prayer card written by A.A. stating

that he did not want to lose his mind and he wanted to injure himself a lot of the time.

A.A.'s treatment with Dr. Cabrera ended in September 2019 upon his retirement. A.A. began to see a counselor, Ms. Brittney Magnum, MA, LPC at Central Texas Baptist beginning on September 5, 2019. A.A. was also meeting once a week with a counselor at school. A.A.'s mental health began spiraling downwards, resulting in frequent suicidal ideation and planning. A.A. made plans to hang himself with plaintiff's belt and to shoot himself with his mother's gun. In this period, A.A. made many calls to the poison control and suicide hotlines. At one point, A.A. verbally threatened his mother's cats. While it is unknown what happened, one A.A.'s mother's previously healthy cats was unexpectedly found dead.

Often, A.A.'s calls to the suicide hotline would result in a welfare check by the College Station Police Department. On November 3, 2019, the College Station police stopped at A.A.'s mother's house for one such welfare check. After taking A.A. to see Ms. Magnum the next day, A.A.'s parents learned from Ms. Magnum that A.A. had developed a detailed plan to commit suicide with his mother's handgun. Ms. Magnum strongly recommended that A.A.'s parents take him to Rock Prairie Behavioral Center for assessment and inpatient admission. Following the recommendation, plaintiff had A.A. admitted at Rock Prairie, where he received acute hospital care for two weeks.

A month later, in December 2019, A.A. became suicidal again. Plaintiff took him to the St. Joseph Health emergency room. After an assessment, A.A. was sent back to Rock Prairie for another acute hospital stay.

Back at home, A.A.'s mental health remained poor. Despite plaintiff's efforts to restrict his son's social media access, A.A. would make disturbing Instagram and TikTok posts

regarding bisexuality, satanism, and abuse. These posts caused both students and parents to complain to A.A.'s school because they were concerned for A.A.'s safety. Plaintiff also found small cuts on A.A.'s arms and asked him about them. A.A. indicated that he had been cutting himself to "fill the void."

In early April 2020, plaintiff set A.A. up for outpatient services at Rock Prairie. These services did not seem to help much. College Station police conducted a welfare check in the middle of the night on April 10, 2020, in response to another call to the suicide hotline. On April 16, 2020, A.A. was again admitted to Rock Prairie for inpatient treatment due to emotional deterioration and suicidal ideation.

In June 2020, A.A. attempted to kill himself in the bathroom of a steakhouse by overdosing on aspirin. After this suicide attempt, A.A. was hospitalized for approximately 10 days. A.A. also began to experience gender dysphoria at this time. Plaintiff connected A.A. with a host of new mental health providers and counselors. These providers did not seem to be effective.

In January 2021, A.A. began to hear voices in his head. At first, A.A. reported hearing seven different voices. (In January 2022, A.A. reported hearing up to twenty different voices in his head). A.A. was withdrawn from school in February 2021 to avoid an expulsion. Around this time, A.A. began to have trouble distinguishing reality from fantasy. This included posting a series of allegations of abuse against his mother and father on social media. A resulting child protective services investigation found these allegations to be unfounded. Plaintiff and A.A.'s mother were investigated by child protective services three separate times in 2021. Each time,

child protective services determined that the allegations were unfounded.

Because of A.A.'s lack of progress in lesser levels of care, it was strongly recommended that A.A. enter into treatment at an RTC. A.A. was admitted to the Menninger Clinic, an RTC, from July 7-21, 2021. The Menninger Clinic thoroughly evaluated A.A., resulting in nine diagnoses: Gender Dysphoria (F64.1); Persistent Depressive Disorder, with Major Depressive Disorder recurrent, severe (F34.1); Generalized Anxiety Disorder (F41.1); Binge Eating Disorder, mild (FS0.8); Trichotillomania (F63.2); Nightmare disorder (F51.5); Parent child relational problem (Z62.820); Other specified trauma and stressor related disorder (F43.8); Cluster B traits. The Menninger Clinic strongly recommended that A.A. be transferred to an RTC called the Polaris Teen Center.

A.A. was transferred to Polaris. At the time of A.A.'s discharge from Polaris, the facility would not permit plaintiff to check A.A. out unless he went straight to Elevations, because the staff at Polaris were concerned that A.A. would become unsafe to himself or others outside of a therapeutic environment. Elevations was one of two facilities identified by plaintiff's therapeutic consultant that offered treatment programs suitable for A.A.'s complicated psychological profile.

**A.A.'s medical history at Elevations**

A.A. began treatment at Elevations on October 21, 2021. Defendant approved coverage of A.A.'s treatment at Elevations through November 17, 2021. Defendant's approval of treatment over that period inherently reflects defendant's determination that treatment at Elevations during that period was medically necessary.

Although defendant stresses a supposed inflection point on November 18, 2021, nothing

particularly notable changed in the reports about A.A. at Elevations immediately before and after that date. The record shows that A.A.'s mental state remained roughly the same as it had been. The record shows some minor fluctuations. For example, there was a notable low on November 11, 2021, when A.A. indicated that he was becoming "more suicidal." On November 15, A.A. was described as "calm" and "compliant." But even then, A.A. was also described as "anxious," "flat," "irritable," and "sad." On November 19, staff described the preceding week as a "difficult week with peers."

Moving a bit further forward in time, A.A. continued to struggle with some of the same old problems. For example, on January 24, 2022, A.A. had regressed back to making false reports of abuse, a behavior that A.A. had exhibited in the year leading up to his treatment at Elevations. On February 3, 2022. A.A. began to believe that his "other personalities" wanted to come out more, harking back to A.A.'s previous experiences of hearing voices in his head.[4]

**Whether A.A.'s continued treatment at Elevations was "medically necessary"**

The key question that the court must answer as the finder of fact is whether A.A.'s continued treatment at Elevations was medically necessary. The plan defines that term as follows:

> Medically Necessary or Medical Necessity means those services or supplies covered under the Plan which are:
>
> 1. Essential to, consistent with, and provided for the diagnosis or the direct

[4] It is worth noting that this followed a concussion; but hearing voices is not, at least according to lay knowledge, a common symptom of concussions.

> care and treatment of the condition, sickness, disease, injury, or bodily malfunction; and
>
> 2. Provided in accordance with and are consistent with generally accepted standards of medical practice in the United States; and
>
> 3. Not primarily for the convenience of the Participant, his Physician, Behavioral Health Practitioner, the Hospital, or the Other Provider; and
>
> 4. The most economical supplies or levels of service that are appropriate for the safe and effective treatment of the Participant. When applied to hospitalization, this further means that the Participant requires acute care as a bed patient due to the nature of the services provided or the Participant's condition, and the Participant cannot receive safe or adequate care as an outpatient.

The parties do not appear to dispute the first three prongs of this definition, and the court's review of the record is consistent with A.A.'s continued treatment at Elevations satisfying these three prongs. In general, the record shows that A.A.'s treatment at Elevations was consistent with and directed at his complex diagnoses, there is no question that Elevations provided its care in accord with generally accepted standards of medical practice, and nothing about A.A.'s treatment seemed particularly convenient for anyone involved.

The factual dispute centers around the fourth prong of the definition, specifically the question of whether it would have been appropriate to provide care for A.A. at level lower than an RTC, for example in an outpatient program like a PDTF or IOP. Of course, as defendant

correctly argues, if A.A. could in fact be treated in an outpatient program rather than an RTC, it would be more "economical."

The parties' arguments over whether A.A.'s continued treatment at Elevations satisfied the fourth prong of the definition center around their conflicting readings of the Milliman Care Guidelines ("MCG") for Residential Behavioral Health ("MCG for RTC"). The court, acting as the finder of fact, is not a medical expert. A civil jury acting as a finder of fact would also not be composed of medical experts. Nevertheless, here, the finder of fact, without any special medical knowledge, must determine whether A.A.'s continued treatment at Elevations met the definition of medical necessity. While the court will address the MCG, it first directs its attention to a crucial part of the definition of "medical necessity" that defendant seems to ignore: "effective." Instead, defendant continuously argues that a lesser degree of care than RTC care would be "manageable."

Based on A.A.'s long running and severely disturbed mental health history, the court finds, by a preponderance of the evidence, that his continued treatment at Elevations was medically necessary because it was the most economical level of service that was appropriate for his safe and effective treatment. A.A. had been extensively treated at lower levels of care, and it was not effective. That's why he was admitted to Elevations. The record does not show that the lower levels of care proposed by defendant would have likely been effective in treating A.A.'s complex mental health issues.

The MCG does not change this factual analysis. Defendant references the MCG for RTC admission criteria. Defendant argues that beginning on November 18, 2021, A.A. no longer met these criteria. But this is a somewhat clumsy sleight of hand; as plaintiff points out, admission

criteria are not the same as discharge criteria. While defendant makes the conclusory statement that "A.A. met the discharge criteria for the MCG for RTC," defendant neither articulates the discharge criteria nor analyzes whether A.A. met them. Thus, this argument is not persuasive.

Overall, defendant's argument is that because A.A. was not actively dangerous to himself or others and was beginning to respond positively to treatment, he could be safely treated at a lower level of care. But this strikes the court as rather like arguing that a person no longer needs an umbrella on a cloudy day because the rain has stopped falling on his head.

Defendant's argument ignores whether A.A. could receive <u>effective</u> treatment at a lower level of care. Evidence that the treatment that A.A. was receiving at Elevations was beginning to be effective is not strong evidence that treatment at a lower level—which had all failed in the past—would also be effective. In contrast, the evidence in plaintiff's favor includes A.A.'s long, troubled medical history and letters from multiple providers supporting the continued necessity of RTC treatment. Plaintiff also shows that as of November 18, 2021, A.A. had not met the MCG discharge criteria. The court finds this evidence more credible than the evidence submitted by defendant.

The court recognizes that in making its finding, it must deal with unknown counterfactuals. Nevertheless, based on the information that was known at the time, plaintiff has shown by a preponderance of the evidence that A.A.'s continued treatment at Elevations was medically necessary, because a lower level of treatment would likely not have been effective. The court finds that such treatment was medically necessary for as long as plaintiff has provided medical records for A.A.'s treatment, which is from November 18, 2021 through September 14,

2022.

## CONCLUSIONS OF LAW

As discussed above, "[a] district court reviews de novo a denial of benefits" in an ERISA case where the administrator does not have discretion, such as this case." Ruttenberg, 413 F.3d at 659. Because the court makes "an independent decision" based on the evidence in the record, the most important issues in this case are decided by this court's conclusions of fact. Dorris, 949 F.3d at 304. Nevertheless, the parties contest a few legal issues that the court discusses below.

**Procedural Issues**

The court agrees with defendant that procedural errors are generally irrelevant to this court's de novo review of whether plaintiff is entitled to the benefit at issue. Plaintiff contends that defendant is foreclosed from now raising a "new rationale" for denying plaintiff's claim. Here, defendant's brief can be read to argue that A.A.'s continued treatment at Elevations was not medically necessary because A.A. was bullied there and any problems A.A. encountered were caused by Elevations' failure to stop the bullying. This was neither a basis upon which defendant originally denied plaintiff's claim nor a basis upon which defendant supported its denial of the plaintiff's claim during administrative review.

Whether a court can consider "new rationales" or "post hoc rationalizations" such as these in an ERISA case is a somewhat live issue in the Seventh Circuit. See Jones v. Unum Life Ins. Co. of Am., No. 24 C 3911, 2026 WL 96985, at *9–11 (N.D. Ill. Jan. 13, 2026) (on appeal as Jones v. Unum Life Insurance Company of America, No. 26-1432 (7th Cir. argued Nov. 4, 2026)). This court is of the view that because Seventh Circuit precedent requires the court to

make an independent decision on claimant's entitlement to benefits, procedural errors committed in the process of denying benefits are not relevant to the court's independent judgment of the record. See Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan, 687 F.3d 320, 328 (7th Cir. 2012) (considering defendant's "post hoc rationalization," and explaining that "whether the plan administrator gave the employee a full and fair hearing or undertook a selective review of the evidence is irrelevant….[and] any procedural foibles [the plan administrator] may have made are irrelevant on appeal"); Jones, 2026 WL 96985, at *9–10. Thus, the court is permitted to consider "post-hoc rationalizations" such as defendant's argument about bullying at Elevations.

The court is sympathetic to plaintiff's argument that this rule—permitting defendants in ERISA cases to provide new reasons to deny a claimant's claims on de novo review—has undesirable ramifications. Under this rule, a defendant can wait for plaintiff to file a Rule 52 motion and only then disclose a new rationale for the denial for the first time in its responsive brief. This practice threatens to render the extensive process preceding such a responsive filing inefficient at best—discovery and briefing is wasted on chasing the "false" reason for the denial—and unfair at worst—plaintiff could be completely blindsided. A second-order consequence of this state of affairs is that future claimants will be unable to accurately evaluate the merits of their claims, because they would not know the "true" basis for the denial of their benefits. This uncertainty would severely undermine the potential for pre-litigation resolution. Nevertheless, the court is bound by its reading of controlling Seventh Circuit precedent, and in this case, defendant's "new rationale" for denying plaintiff's claim—that treatment at Elevations

was not medically necessary because A.A. was bullied there—is not persuasive.

**Weight of evidence**

The court briefly addresses defendant's various arguments that certain pieces of evidence cannot support plaintiff's claim by a preponderance of the evidence.

Defendant argues that letters from A.A.'s former providers before his treatment at Elevations should be rejected because they do not "assess the member's condition at the time of treatment and are written to obtain coverage." In support of this argument, defendant cites Christine S. v. Blue Cross Blue Shield of N.M., 2:18-cv-874, 2021 WL 4805136, at *5 (D. Utah Oct. 14, 2021) and S.M. v. United Healthcare Oxford, 22-cv-262, 2024 WL 4028259, at *8 (D. Utah July 26, 2024). Contrary to defendant's argument, the court in Christine S. did consider the letters from previous providers, but found they were outweighed by other, stronger evidence. See 2024 WL 4028249 at *7 (stating that "the court has considered the opinions of T.A.'s treating physicians but remains convinced that continued RTC treatment was not medically necessary"). Similarly, in S.M., the court considered letters from previous providers but found they were outweighed by other evidence. See 2024 WL 402859, at *13 (explaining that "two of three letters are not sharing contemporaneous observations, but rather are based on much earlier interactions with L.M. This does not make them irrelevant, but on this record it makes them less helpful"). The court's factual findings are based on the entire record, and defendant has not shown that the court is precluded from considering provider letters from before A.A.'s treatment at Elevations. The court considers those letters and assigns them the weight they deserve.

Defendant also attempts to argue that plaintiff's history of failed outpatient placements does not independently establish medical necessity for RTC level care. The cases cited by

defendant on this point do not hold that a court cannot consider evidence of a history of failed outpatient placements. See Ariana M. v. Humana Health Plan of Tex., Inc., No. CV H-14-3206, 2018 WL 4384162, at *14–16 (S.D. Tex. Sept. 14, 2018), aff'd, 792 F. App'x 287 (5th Cir. 2019); Rachel W. v. Blue Cross Blue Shield of Texas, No. 4:22-CV-00886, 2025 WL 3050168, at *11–12 (S.D. Tex. June 20, 2025). As the court has stated many times, it makes its factual findings based on its review of the entire record rather than any single piece of evidence. Thus, defendant's arguments that a certain piece of evidence is not independently sufficient to support a factual finding are beside the point.

Because courts in ERISA cases like these are required to make "an independent decision about the [beneficiary's] entitlement to benefits," the outcomes of other ERISA cases are inherently quite fact-bound, rendering comparisons to other cases less useful than in more typical legal contexts. Marantz, 687 F.3d at 328. For example, defendant characterizes C.T. v. BlueCross BlueShield of Illinois, 2025 WL 4092204 (N.D. Ill. Apr. 17, 2025), as a case where a court held that RTC was not medically necessary when the patient had symptoms "far more severe" than A.A.'s. Unlike this case, C.T. concerned whether the patient needed RTC treatment at all, rather than whether the patient needed continued RTC treatment like A.A. Id. at *7. In C.T., the judge noted that the patient had "no suicidal ideation or self-harm beyond the incident that took place when [the patient] was eight years old, about seven to eight years prior to his RTC treatment." Id. at *6. This is in stark contrast to the facts of this case, where A.A. attempted suicide more than once, and police wellness checks due to A.A.'s calls to the suicide hotline were a regular occurrence in the time leading up to his RTC treatment. The court will not go on to differentiate every case defendant relies upon. Instead, the court observes that, like C.T., each ERISA case presents a unique set of facts upon which a court must make an

independent decision. The court has done so here.

**Gaps in the Record**

As defendant correctly points out, the record does not contain medical records beyond September 14, 2022. The Seventh Circuit has stated that "any gaps in the record cut against [claimant's] claim." Oye, 140 F.4th at 837. Consequently, plaintiff has failed to carry his burden to show that the continued treatment was medically necessary past September 14, 2022, the last date that medical records have been provided.

**The Parity Act**

Count II alleges that defendant violated the Parity Act. The Parity Act was passed to "ensure that health insurance plans would confer benefits for mental health and substance abuse disorders at parity with medical and surgical benefits." Stephanie R. v. Blue Cross & Blue Shield of Illinois, 815 F. Supp. 3d 809, 816 (N.D. Ill. 2025). The Seventh Circuit has not yet addressed a Parity Act claim. Courts in this district have generally employed a four-part test to evaluate Parity Act claims. Plaintiff must show that: (1) the relevant group health plan is subject to the Parity Act; (2) the plan provides both medical/surgical benefits and mental health or substance use disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4) the mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared. Id.

Here, there is no dispute that the health plan is subject to the Parity Act or that the plan provides both medical/surgical benefits and mental health benefits. And there is also no dispute

that the comparison that plaintiff is making—between RTC treatment and treatments at skilled nursing facilities, inpatient rehabilitation facilities, or inpatient hospice facilities—is between treatments of the same classification. See 29 C.F.R. §290.712(c)(2)(ii) (explaining classifications); 78 F.R. 68247 (explaining that "skilled nursing facilities or rehabilitation hospitals" must be at parity with "residential treatment facilities for mental health"). Plaintiff's claim is on the third prong: that defendant disparately applies medical necessity criteria between medical/surgical and mental health treatment. Plaintiff argues that in A.A.'s case, defendant applied a limitation on A.A.'s treatment at an RTC using criteria that were more stringent than would have been applied for an analogous medical/surgical treatment. Specifically, plaintiff argues that defendant's denial letter stated that A.A. did not need treatment at Elevations because among other things, he was not hearing voices telling him to harm himself or others, had no plan or intent to harm others, was not aggressive, and had no plan or intent to harm himself. According to plaintiff, these are acute mental health symptoms. Plaintiff contends that in determining whether to cover analogous medica/surgical treatments—treatments at skilled nursing facilities, inpatient rehabilitation facilities, or inpatient hospice facilities—defendant would not similarly require the patient to exhibit acute symptoms. Thus, plaintiff argues, defendant imposed a limitation for A.A.'s mental health treatment that is more restrictive than the limitations applied to medical/surgical treatments, in violation of the Parity Act.

Defendant responds that it uses similar standards to evaluate whether medical/surgical treatments and mental health treatments should be covered. Defendant points out that the plan's "medical necessity" definition applies to all treatments. In addition, defendant argues that it uses the MCG to determine both whether treatment at a skilled nursing facility is covered and whether treatment at an RTC is covered. Separately, defendant argues that plaintiff has failed to prove a

Parity Act violation because he has not offered any evidence comparing defendant's coverage of analogous medical/surgical treatment.

The court finds that plaintiff has failed to prove a Parity Act violation. Based on the record before it, the court finds that there is parity in defendant's stated policy of how it applies treatment limitations: for both medica/surgical treatments and mental health treatments, defendant uses the MCG. And more broadly, the plan utilizes the same medical necessity definition for all treatments.

The other way that plaintiff could prove its claim is at the level of practice. That is, plaintiff could show that despite the stated policy of parity, defendant in fact applies different limitations to analogous medical/surgical and mental health treatments. Some courts call this an "as-applied" challenge. See Stephanie R., 815 F. Supp. 3d at 818 (explaining that such a "challenge requires plaintiffs to identify facially neutral plan terms that are applied differently or more restrictively in practice on mental health or substance abuse disorder treatments").

As the court noted above, it agrees with plaintiff that defendant failed to properly apply the MCG in denying coverage for A.A.'s treatment, because defendant failed to differentiate between the MCG's admission and discharge criteria. This failure explains why defendant improperly based its denial of continued coverage on the absence of acute symptoms; the acute symptoms are elements of the MCG admission criteria, but the lack thereof is not sufficient to satisfy the MCG discharge criteria. But defendant's failure to properly apply a limitation (here, the MCG discharge criteria for RTC treatment) to a mental health treatment says nothing about how defendant applies limitations to analogous medical/surgical treatments. On this point, plaintiff has not provided any evidence as to how defendant applies the MCG (or treatment

limitations more generally) to surgical/medical treatments in practice. Because plaintiff provides no evidence of how defendant applies the MCG to surgical/medical treatment in practice, the court is left with nothing to compare the denial of A.A.'s continued RTC treatment against. Consequently, on the record before it, the court cannot find that the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits. The court finds that plaintiff failed to carry his burden to prove by a preponderance of the evidence that defendant violated the Parity Act.

## CONCLUSION

For the above reasons, plaintiff's motion for judgment on the record (Doc. 68) and defendant's motion for judgment on the record (Doc. 73) are both granted in part and denied in part. The court finds for plaintiff on Count I limited to A.A.'s treatment at Elevations from November 18, 2021, through September 14, 2022. Defendant is directed to reimburse plaintiff for the cost of A.A.'s treatment at Elevations from November 18, 2021, through September 14, 2022. The court finds for defendant on Count II. Plaintiff is directed to submit a proposed final judgment order consistent with this opinion by December 10, 2026.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: November 18, 2026**